Once they are out and the next group is here, we will hear the last case of the oral arguments today. Okay. So, we'll hear case number 23-50098, DOH Oil Company v. Cawley, and we'll hear from Matthew Walcott. May it please the court. DOH and Johnson alleged that the defendants created and filed 31 fraudulent mineral deeds on DOH's property that they knew to be invalid and filed a series of five sham lawsuits against DOH on those properties and repeatedly threatened to do the same as to other property owned by DOH until DOH gave them what they wanted, which was half of the subject mineral interest and half of its revenues from them. The magistrate judge agreed that those allegations satisfied the pattern of racketeering activity. The district court did not. The foundation of the district court's opinion was its finding that the predicate acts were not interrelated under the continuity plus relationship test. It rejected the complaint's allegations that all predicate acts were part of a continuous pattern of racketeering activity and instead characterized them as pleading two separate and unrelated patterns, one of mail and wire fraud in the taking of the mineral deeds and one of extortion regarding the litigation activities. The lack of relatedness was not a ground on which the defendants sought dismissal. But that finding in sort of setting up that divide and conquer analysis, which allowed it to then attack mail and wire fraud on one ground and the extortion scheme on another ground, in making that finding, the court ignored material allegations and facts that were directly relevant to that analysis. Specifically, it ignored many documents and communications that were described in the complaint and put into the evidence that showed that tied the taking of the mineral deeds to the subsequent litigation activities. Throughout their communications, the defendants acknowledged that DOH is the record and actual owner of the mineral interests that their mineral deeds were purporting to cover and therefore not as the district court, they weren't taking them as the district court suggested independently of DOH's title. They knew it impacted DOH's title. It also ignored a number of allegations showing that at the time they were taking these mineral deeds, they acknowledged the plan was to use them to file suit against DOH. In which many of the communications, solicitation letters, agreements between the parties, emails specifically referenced the plan to file suit once the mineral deeds are in hand. When the court then went on to the subsequent analysis where it got rid of the mail and wire fraud by finding no injury and then addressed the extortion scheme by finding lack of continuity, it also made a material omission on continuity. It characterized these demands that were sent by the defendants as only offering to settle the existing claims, but it omitted that those same demands contained an implicit threat that the scheme would be repeated as to other property owned by DOH if it didn't capitulate. So only by omitting those allegations was the court able to characterize this the way it did, which is basically that the plaintiffs are just complaining about run-of-the-mill title litigation or a situation where a landman thinks that he found a gem in the title records and is just trying to exploit a title defect. But when we put into the analysis those allegations that were ignored, what we have is a pattern of racketeering activities that the purpose of which is to target and extort a company, DOH, out of its property. And we've provided a handout for the court. I'm not going to really talk about it other than just to say it's for the court's reference after this case is submitted. But it just shows the difference between the allegations as pleaded in the complaint and the court's characterization of those allegations, and it shows some of the material allegations that were just left out by the district court. So to really understand what the actual pattern of racketeering activity was that was being alleged requires a little more background. DOH and Johnson own mineral interests in West Texas, and they've acquired many of these mineral interests over the years through tax foreclosure sales, some of them dating back two or three decades. Sometime in early 2018, Aaron Koehl, who is Ridgefield's general counsel, discovered that one tract on which Ridgefield was attempting to buy mineral interests from an individual had actually been foreclosed upon and sold to DOH about 20 years prior. And it was that discovery, along with his discovery that DOH had acquired other interests at other tax foreclosures, and a discovery that DOH had in the past conveyed back to foreclosed owners a portion of what it bought at the foreclosure sales that sort of fomented the RICO scheme at issue. Aaron Koehl and Ridgefield's CEO, Steve Kerrigan, devised this scheme where they would basically track down the heirs of foreclosed owners, foreclosed owners from sales where DOH had purchased mineral interests, and send them solicitation letters and give them a choice. They could do, Ridgefield would pay them to execute a mineral deed to Ridgefield of all right title and interest in a tract, or for less money, they could execute a mineral deed purporting to convey a portion of the interest, and then participate in subsequent litigation against DOH that would be headed up by Ridgefield. Again, many of those communications during the time that these mineral deeds are being acquired by Ridgefield acknowledge that plan to file suit against DOH. And there's even an email that refers to the whole scheme as the, quote, tax foreclosure project. So if you were writing the opinion to reverse, what is the paragraph you would say on how this does distinguish from these usual, because there's always title disputes and that kind of thing, and that doesn't strike me as something that should be considered a RICO violation. So explain to me what the specific sort of paragraph is that you think distinguishes this. I mean, you've talked a little bit about it, but how do you wrap it up into something that falls under the statute? I think it is just what would be in this court's opinion, or is there a portion of the district court's opinion? No, I mean, well, we can only write our opinion. We can't write the district court opinion. Well, I think that the main point is that if we include the facts that were excluded by the district court, this does fall within the letter of RICO, which is broad. The district court at times through the opinion sort of characterizes RICO of being narrow and that it's not designed to attach to this kind of conduct. That really seems to be based on the subject matter, that this involves mineral interests. But that's also a policy debate that was settled nearly 40 years ago under the Sedema case. RICO is broad, and it attaches to all types of enterprises, both legitimate, illegitimate, sophisticated people, unsophisticated people. And they've made it clear that by including predicate criminal acts such as mail-on-wire fraud, it is broad enough to attach to something that isn't necessarily an organized crime racket. But I would add one of the quintessential, I guess, lay understandings of a criminal racket involves an offer to solve a problem that wouldn't exist but for the racket. And the H.J. Court's example of this was the hoodlum walking down the street selling window insurance or offering window insurance to businesses. And what the defendants were doing here was essentially the same. These settlement demands weren't just offers to settle their existing claims. They contained a promise that if you give us half of the property, Ridgefield will never create other problems for you again on other mineral property that you own. There would be no other mineral deeds on other property. There would be no other litigation on other property. They sent that first demand. DOH rejected it. And they carried that threat out. They went out and got more mineral deeds in another county on other property, filed them in the public records. The difference is knowing there's a problem as opposed to I went and bought a house, thought I bought the house, and then all of a sudden found out there was a problem with the title and so on. You're saying it's because they're going out and sort of on purpose gathering all this property to further fight with the DOH. That's correct. That's the difference between the sort of ordinary cases that the district court is talking about. I mean, that's what I'm trying to get at is, like, what is that point? Okay. We litigate title disputes a lot. And it's not uncommon to have a hidden gem type of case where someone's just testing a theory. But what the evidence and the allegations here show is that the only criteria that the defendants were using to determine where to buy these mineral interests and why to go get them is, does DOH own it and is it generating revenue? So when we include those elements, I mean, I think they go to things like fraudulent intent and extortionate intent. But what it really does is it destroys the pattern of racketeering analysis because it shows that everything they were doing was interrelated. And what do you think is your best case for the standpoint that that is a RICO violation? I do think it's the H.J. case. I would also point out that the summary judgment evidence included a spreadsheet that showed that Ridgefield had identified 66 other mineral tracks owned by DOH in a single county alone. So after the court divided everything out into two separate and unrelated schemes, it then attacked what it called the mail-and-wire fraud scheme for lack of injury. Those holdings were basically that there has to be a RICO injury, which the Sedema court held is not a requirement under RICO. You just have to have an injury from the predicate acts, which was alleged. The title, the clouds on title, the suspension of revenues, and the legal fees that were incurred in defending the litigation are all actionable. And then excluding the mail-and-wire fraud acts, the district court held that the residual litigation activities didn't have the requisite continuity. Now, first, if you put all those mail-and-wire fraud acts in, you've got a two-and-a-half-year period of hundreds of acts with a threat of projecting into the future. So it satisfies continuity. But I would also just draw the court's attention to that fact, that even though they had filed five of these before they were sued in this RICO action, the evidence showed that there's no inference that they were going to stop at five. That's reasonable. They have identified dozens and dozens of other tracks owned by DOH. And, again, these communications indicate that the whole plan is to take the mineral deeds, get them in the public record, and then follow them up with the extortionate litigation. I'll reserve the rest of my time for rebuttal if there's no other questions.   Thank you. We'll now hear from John McFarland, our colleague. It's four copies of a document. Okay. Mr. McFarland, please begin. May it please the Court. This case, in some ways, presents the question, why is a cat not a banana? And that is really the foundation for the district court's opinion dismissing these claims. It's not continuity and relatedness. All that analysis follows the first two pages, which lays out Judge Count's common sense conclusion that going to the records, finding busts in title, contacting the property records who you think might have those interests, and going and litigating those if the operator doesn't accept that you have superior title, is standard operating procedure in West Texas. It's not illegal conduct and won't support RICO. That's in the first two pages of Judge Count's opinion, and it's spot on and it's the real basis for the dismissal. He goes through the RICO analysis and almost assumes arguendo that if that was illegal conduct, that this still would not satisfy RICO. I note that for the appellants to prevail on that would require, first, that this Court agree that this conduct constitutes indictable offenses, such that we're talking that RICO is implicated, and then you go through the rather nebulous, rather complicated analysis that RICO has for continuity, enterprise, and connectedness. But you have to start with, was the conduct illegal? Was it illegal to go to the land records and look for busts in title? Was it illegal to approach those property owners and see if they'd be willing to sell the title that you think they have to you? The answer to these questions is no, and you can't characterize it. It's wire fraud. That doesn't make it wire fraud. And allegations in a petition, you strip away the nefarious. You strip away those kinds of characterizations, and you look at the actual conduct alleged. And the actual conduct alleged here is going to the land records, finding title that you think is a bust, approaching those property owners, acquiring the putative interest, going to the operators and seeing if they'll recognize your interest. If they don't, filing the lawsuit to clear the cloud on title. And if you're in litigation and you can't settle, to me that's one of the linchpins of the cases, that offering to settle litigation was extortion. So that's what the case is really about. This is not illegal conduct. And I think you can start there and you can stop there. I do want to address an argument that the appellants made in their reply brief, because it's really instructive when you dig through it. They argue that the appellees misrepresented what the sheriff's deed says, how the sheriff's deed describes the property, and this is critical to the bust. So the sheriff's deed will state, convey all right, title, interest, et cetera, to what the defendant owns in this tract of dirt. And then, okay, that's what it says. But it's a sheriff's deed. A sheriff's deed must be construed along with the tax judgment, because the sheriff's deed cannot convey more than the judgment foreclosed. And as a happy chance, the sheriff's deed actually says that. So if you're doing a four corners analysis of the sheriff's deed, it directs you to actually 12 corners. It says, so we talked about how the interest was described by reference to a lease. And they say that's misleading because there's general language that says all right, title, interest, et cetera. Now, one, the Diamondback opinion addressed that and said, nope, we're not going to let the general trump the specific. If you describe the interest by reference to a lease, you got the royalty, which is important because if you only got the royalty, then when the lease terminates for a cessation of production, the mineral interests go back to the original grantor. And that is the theory of our case, that these leases in some instances had terminated, and therefore the interest went back to the original grantor. So the mineral interests were still enforceable after that point? Yes. So when a grantor signs a mineral lease, it grants the minerals, the possessory interest in the minerals to the operator who then can drill and do all the things it doesn't. But in exchange for that, it gets a royalty interest. But when the lease terminates for a cessation of production, then the grantor gets his minerals back. Did you know when they had terminated? I'm sorry? Did you know when they had terminated so you could go back and try to negotiate? So not in every instance, but the analysis is, okay, was this property acquired through a tax foreclosure? Yes. Did the tax foreclosure documents describe a royalty interest and not the whole entirety of the mineral interest? Yes. Is it enough money to fight about? Yes. I mean, it's not just — it's not targeting Doe, and there's no evidence in the record that it is. And they don't even allege that this was a Doe-targeted thing. And the fact that the Diamondback opinion exists shows that it's not a Doe-targeted thing. But that's into the weeds. Falling through on the threat. I think the argument is the first thing they bought wasn't Doe-targeted, but once they realized it, it became Doe-targeted. And when Doe wouldn't give them what they wanted, it became a Doe-go. Doe, like any other entity that acquires these interests through tax foreclosure sales, if it acquired an interest that is — that our analysis concludes was a royalty interest and not the underlying minerals and has a lease that has terminated for a cessation of production and there's enough money to fight about, that is something we would consider falling through, but it's not just Doe. Okay. Getting back to the sheriff's deed and why this is important. So Mr. Wolcott wants you to stop your analysis of the title at the sheriff's deed. But as I said, Texas law requires you to look at the judgment. So does the sheriff's deed, though. The sheriff's deed says right before the part where it describes a section, block, and survey, it says we're conveying the interests of all defendants here and above named as foreclosed in cause number 97, etc., here and above described without warranty of any kind, kind of an important phrase, as described in the order of sale. Now, what does that tell you if you want to know what was conveyed? You can't stop here. You have to look at the judgment to determine what was foreclosed. So you have to interpret the judgment to know what was conveyed. You have to look at the order of sale to know what was ordered to be sold. The sheriff's deed can't convey more than was foreclosed and can't convey more than it was ordered to sell. So there are two very important concepts. But it's also, it dovetails into another argument, one that the appellants didn't make. But in this argument, they've made the argument, they argue that the tax code statute of limitation applies. And we agree that the tax code statute of limitation applies to protect the title that one obtains from the sheriff's deed. But the first thing you have to figure out to know what the statute protects is what was conveyed, because that's what's protected. And I've been banging this drum. I don't understand why it doesn't get through. Tax code's limitation protection extends to the interest that was conveyed by the sheriff's deed, which can't be understood without looking at the tax judgment.  And Diamondback stands for the proposition that in that instance, you've only acquired the royalty interest and the possibility of reverter and can have the minerals go back to the original grantor or its successors in interest. All right. Another argument that the appellants put in their brief is that implausibility has been waived. I'm a little befuddled by this, but I would just point out, allegations have to be plausible in the context of analyzing a motion to dismiss and analyzing the allegations put forth in a plaintiff's complaint. They must be plausible. The court is not obliged to accept implausible allegations. That's part of the standard of review. The appellees did not waive it. Not only were none of the acts that we've described here illegal, none of the acts, let's go through the, there's two buckets of acts. There's the acts leading up to the acquisition of the mineral interests, and then there's the acts leading to the litigation. Going to the land records, no harm. No harm to the appellants. Going to the putative landowners and negotiating to purchase some or all of their interest, no harm. So those, that whole, and that's where the alleged wire transfer illegal conduct occurs. So there's no harm there, no injury. And then you turn to, well, we've incurred legal fees. You had our royalty suspended in the litigation. As Judge Counts noted, that's what happens when someone has a title dispute with you. The operators will suspend royalties, and you'll have to hire a lawyer to defend your title. These cases have been pending for three years before they were abated in favor of this one, the federal court case. If these claims to title were frivolous, there would have been some resolution, I would assume. Summary judgments were filed in both ways. The only party that's won a summary judgment are the appellees. But not against DOH. Not against DOH. But was it an identity situation? These are the exact same situations. Okay, but this one, to me, has an add-on to it, which is this, oh, we're going to go get them, and so we're going to do this. It's a little bit different from just, oh, I bought this property and then found out there was this little thing here that I need to deal with, so I guess I better figure out how to do that, and so on. I mean, yes, I'm well aware of title claims, but this just seems a little bit different. So if you find that hidden gem, okay, that Mr. Wolcott acknowledges comes up every now and then, and you find that there are certain repeat players, DOH is not the only one, who bought not hundreds of these, thousands of them. They have putative claims to thousands of people's royalty interests. So you might end up going and looking and seeing. If you know that DOH's modus operandi in the late 90s, sorry, DOH, I'll go with y'all's nomenclature. I've litigated this for five years. We've always called them DOH, but. Oh, sorry. No, it's fine. Whatever their name is. It's. The Appellants. The Appellants. I think I can pronounce that. Right. If you find that they had that as their business model, and you can go through and find the same bust, the same little gem on multiple occasions, it may look like targeting to DOH, to the Appellants, but it's not, and even if there was targeting, I suppose, how does that get you to RICO? I mean, there are repeat players in the litigation process that are targeted because their conduct is such that they need to be targeted. There shouldn't be a quotient if DOH is holding title that is not its proper title. If there's a bust in its title, there's no reason why someone should refrain from going and challenging that title. If there are mineral interests out there that rightly belong to somebody else, and that's the position that we're in. Counselor Yarge, that is what I wanted to cover with you. I'll yield my time, unless you have questions. Okay. Thanks very much. We'll now hear the rebuttal. Thank you. Much of the argument that these claims have merit goes to an issue that was not raised below and that the district court didn't address, which is the sham exception to the Norr-Pennington Doctrine. They've agreed that that was not a basis for the district court's opinion. What briefing there was on the merits of these underlying claims was done under the Rule 12b6 standard, which just has to show that the Norr-Pennington Doctrine does not apply on its face. The Norr-Pennington Doctrine basically says you have a right to petition the court. The district court didn't rely on any extrinsic evidence in its opinion, let alone evidence that involved the merits of their lawsuits. And we specifically asked the district court if it was going to consider this issue for leave to respond to this issue on the merits, under the summary judgment standard. And we were denied that opportunity. And now the defendants essentially want this court to engage in this analysis on an incomplete record and be the court that has the first bite at this apple. So we think that's improper because it just hasn't been fully developed at all yet. But that's another reason that we were asking that it be reversed is it does seem like the defendants want to pursue this issue and focus on the merits. Do you want to reverse it as a 12b6 and send it back for a summary judgment? Well, we're asking that the court reverse the court's dismissal primarily on the grounds that its analysis was incorrect under the pattern of racketeering activity. I think it's fair to say that everybody, I think, is ready to move on to another issue in this case, which is getting to the merits of the title claims, getting to the merits of the sham exception. Does it really apply to all the conduct here? Which it doesn't because even excluding the litigation activities, even excluding whether the Norr-Pennington Doctrine could apply to some of the acts, there's a whole pattern of racketeering activity that involves taking and filing mineral deeds that they knew were invalid, that they knew gave them no title, using them to cause intrigue to DOH before they ever filed a lawsuit. Beyond that, though, the sham exception looks at when there's a series of sham lawsuits. The question isn't do you look back and see whether the arguments that the lawyers came up with after the fact might have some merit. The question is prospective. From the time that they're doing the activities, do they have a probable cause or a reasonable belief in success on the merits? And there was no evidence that the defendants were picking these properties because they thought there was a specific title gem within them. And the only evidence was here's a list of foreclosure opportunities against DOH oil, and here are the ones that are starting to generate revenue. There's an email in the record that specifically it's referring to the Lula Eads interest in what we call Section 3, and it's an email from Aaron Koehl to his partners saying this interest was foreclosed upon and sold to DOH. I initially didn't consider it, but then I saw that there's a well there that's produced 150,000 barrels of oil. There's no indication in that piece of evidence or in any other evidence that was before the court that there was any other criteria used in deciding where to go and get these mineral deeds other than is it DOH's property and is it worth something? And I would also add that the argument that the court assumed that mail and wire fraud were adequately pleaded. So they never challenged the adequacy of those pleadings, and they said in their motion that the pleadings should be accepted. The argument that this is the exact same situation as some other case that involves different parties and different mineral interests, part of that is the conduct that's being complained of here because part of what we're saying is the abusive conduct is that they have made basically the same arguments across every case that they've filed against DOH, but without regard to the actual facts. And I see my time is up. Okay. Thank you to both sides. This case is under submission, and this panel has now concluded our oral arguments for this week. Thank you.